**Willie PEP, Plaintiff,**

v.

**NEWSWEEK, INC., Defendant.**

**No. 81 Civ. 1766 (MEL).**

United States District Court,
S.D. New York.

Jan. 5, 1983.

John P. McKeon, Hartford, Conn., for plaintiff.

Rogers & Wells, New York City, for defendant; Stephen Froling, Nicholas J. Jollymore, New York City, of counsel.

LASKER, District Judge.

This action for libel arises from the publication of an article entitled "The Fix", in the July 30, 1980 issue of *Inside Sports,* a magazine then published by Newsweek, Inc. The author of the article was Paul Good, a freelance journalist; the editor was Peter Bonventre, *Inside Sports'* Managing Editor.

The article infers that Willie Pep, a former championship boxer, "fixed" a fight held on February 26, 1954.[1] Good's primary source for the article was one Norman Brett, who purports to have had personal knowledge of "the fix," based on his close companionship with Pep during the relevant period and his own attempted participation in the planning of the transaction.

Newsweek moves pursuant to Fed.R. Civ.Pr. 56 for summary judgment on the question of actual malice: it contends that there is no genuine issue of fact as to the question whether the article was published with knowledge of its falsity or reckless disregard for its truth or falsity.

Pep answers that Newsweek's major source, Norman Brett, was a convicted felon, a swindler and a self-described "pathological liar" and that Newsweek was aware of his character and his criminal record at the time that it relied upon him as the principal source for the article. Newsweek's failure to obtain independent corroboration of a story based on the word of a man of Brett's character, Pep argues, at the least creates a question of fact as to whether Newsweek published the article with reckless disregard for its truth or falsity.

Newsweek concedes that Brett "has not lead a blameless life." (Newsweek Memo-

randum of Law at 53). In fact, in its 3(g) statement, Newsweek candidly refers to Brett as having formerly been a "compulsive gambler, a vice which he has admitted led him into a series of unethical and illegal acts" and quotes Brett as having referred to himself as a "pathological liar." (Newsweek's Statement of Material Facts, ¶ 30). However, Newsweek contends that Brett presented himself to Good and Bonventre as a man who, thanks to his participation in Gamblers Anonymous, had changed his ways, and that Good and Bonventre, after thoroughly interviewing Brett, found him worthy of belief. Moreover, Newsweek contends that it did some independent corroboration of the story by reviewing contemporary news clippings, and that further attempts at corroboration would have been futile. Finally, Newsweek contends that it was entitled to rely entirely on Good, a well-respected author and a former Newsweek employee who had known Bonventre personally since they had shared an office together in 1971 or 1972.

\*    \*    \*    \*    \*    \*

A defamation plaintiff who is a public figure has the heavy burden of proving actual malice with "convincing clarity." *Yiamouyiannis v. Consumers Union,* 619 F.2d 932, 940 (2d Cir.1980). Although we are aware of the scores of cases in which summary judgment has been granted on the question of actual malice, we note that, under *Yiamouyiannis, supra,* a motion for summary judgment in a libel action is to be treated no differently than a motion for summary judgment in any other action. *Id.* The standard for deciding summary judgment in such a case is as follows:

"In a case where the defendant has moved for summary judgment on the issue of actual malice and the plaintiff claims that there remain material factual disputes, the court decides the materiality of the disputed facts by accepting the plaintiff's version and applying the actual malice standard. This standard requires a clear and convincing showing, which may be by circumstantial evidence, of

---

1. Although Pep is not named in the article, Newsweek does not deny that he is the subject.

defendant's actual state of mind—either subjective awareness of probable falsity or actual intent to publish falsely."

*Yiamouyiannis, supra* at 940.

The actual malice standard is subjective: accordingly, the question presented here is whether a reasonable jury could find with convincing clarity that Newsweek employees "in fact entertained serious doubts as to the truth of [the] publication." *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968).

In *St. Amant,* the Court listed a number of factors relevant to the determination of recklessness. Among others, it stated, "recklessness may be found where there are obvious reasons to doubt the veracity of the informant." *Id.* at 732, 88 S.Ct. at 1326. We conclude that, in the circumstances of this case, there were "obvious reasons to doubt the veracity" of Norman Brett, and that, accordingly, a reasonable jury could find that Newsweek employees "in fact entertained serious doubts as to the truth of [the] publication." *St. Amant, supra,* at 731, 88 S.Ct. at 1325.

Bonventre stated that at the time he met with Brett in connection with the article, which was then in a preliminary stage of preparation, he had been advised that Brett was a convicted felon, "a swindler," and "a con man." (Deposition of Peter Bonventre at 24). Yet, aside from reading some newspaper clippings concerning the fight and accepting Good's word that Brett was "reliable," Bonventre made no attempt to corroborate Brett's account of the story. (*Id.* at 23–24). Moreover, with respect to Bonventre's reliance on Good's appraisal of Brett, when Good was asked whether Bonventre has asked for "a professional assessment of [Brett's] reliability," Good's answer was limited as follows:

"Well, first of all, Mr. Bonventre, when he first discussed this, asked me what I thought about Brett, what did I know about him, could I depend on him, and my answer was yes, *as far as I know.*" (Deposition of Paul Good at 58) (emphasis added).

Although Bonventre and Good have stated in affidavits filed in support of the motion that they were convinced of Brett's truthfulness, "[t]he defendant in a defamation action ... cannot ... automatically insure a favorable verdict by testifying that he published with a belief that the statements were true." *St. Amant, supra,* at 732, 88 S.Ct. at 1326. On the question whether Bonventre actually believed Brett, the jury would be entitled to consider the fact that he knew of Brett's history of deceit.

Newsweek's contention that it did as much independent corroboration as it could have done is unpersuasive on the present record. Although Bonventre states that he read news stories written contemporaneously with the fight, he apparently missed the stories which were brought to our attention by plaintiff. In addition, Newsweek failed to interview critical witnesses to the events, such as Edmund Brown, the "Brownie" of the story, or even Pep himself.[2]

Newsweek's argument that it was entitled to rely on Good, the author, is beside the point. The question presented by the instant action is not whether Newsweek could have purchased an article from Good, sight-unseen and no questions asked, and then published it with immunity from libel. To the contrary, the issue is whether, knowing what Newsweek knew,—in particular, the identity and background of Good's principal source—the Newsweek staff "in fact entertained serious doubts as to the truth of

---

**2.** Newsweek's argument that Pep and Brown, if interviewed, would have responded only with unhelpful, blank denials is speculation. Newsweek never asked the questions, and it cannot know whether the answers would have provided information which would have been helpful in determining what really happened.

Although Good did interview Pep on one occasion, he did not confront him with Brett's story and offer him an opportunity to respond. In fact, he did not even tell Pep that the interview had anything to do with the fight in question— he told Pep that he was writing a book on Brett and that he "wanted to talk to him about his knowledge of Norman Brett." (Deposition of Paul Good at 17–20.)

[the] publication." *St. Amant, supra,* at 731, 88 S.Ct. at 1325.

The cases cited by Newsweek for the proposition that failure to investigate a story does not necessarily constitute actual malice are also inapposite. On a motion for summary judgment, the question is not whether mere failure to investigate a story can, standing alone, constitute malice. Rather, the issue is: What did Newsweek (Bonventre) actually believe? Did he have serious doubts about the accuracy of the story? Facts such as failure to investigate, or reliance on a questionable source are relevant to that determination: they may tend to show that a publisher did not care whether an article was truthful or not, or perhaps that the publisher did not want to discover facts which would have contradicted his source.

It is true that a plaintiff in a libel suit against a public figure has a heavy burden of proof. He must show with "clear and convincing proof" that defendants published the libel with actual malice, that is, knowledge of falsity or reckless disregard for the truth. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789 (1974). It is also true that Newsweek has put strongly in issue plaintiff's ability to meet that burden.

Nevertheless, without making any finding on the merits, we conclude that on the record as it stands a reasonable jury could find with convincing clarity that Newsweek "in fact entertained serious doubts as to the truth of [the] publication," *St. Amant, supra,* 390 U.S. at 731, 88 S.Ct. at 1325.

Accordingly, the motion for summary judgment is denied.

It is so ordered.